# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE ASACOL
ANTITRUST LITIGATION

Civil Action No. 1:15-cv-12730 (DJC)

**DECLARATION OF MEREDITH ROSENTHAL
IN RESPONSE TO DEFENDANTS' JOINT MOTION
TO COMPEL PRODUCT MARKET DISCOVERY**

## EXECUTIVE SUMMARY

I have been retained by counsel for both the Direct Purchaser Class Plaintiffs ("DPPs") and End Payor Class Plaintiffs ("EPPs")[1] of Asacol to opine on whether or not the defendants' request for discovery materials in their November motion[2] is relevant to the determination of market definition in this matter. I have reviewed the request and reached the conclusion that these materials are not, in fact, relevant or useful for any expert to apply standard and scientifically accepted methods of market definition. This declaration discusses the relevant issues and the specific reasons for my conclusion.

## I.    QUALIFICATIONS

1.      My name is Meredith Rosenthal. I am a Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of Greylock McKinnon Associates ("GMA"), a consulting and litigation support firm. My principal research interests concern the economics of the health care industry.

2.      At Harvard, I have taught in undergraduate, Masters- and Ph.D.-level health economics and health policy courses. Since 1996, I have worked on a number of consulting matters through GMA, most of which relate to litigation in health care markets generally and the pharmaceutical industry in particular. I have submitted written and in some cases presented oral testimony in litigation concerning allegations of improper marketing of the following prescription drugs:

---

[1] *In re Asacol Antitrust Litigation* (relating to all actions), Civil Action No. 1:15-cv-12730 (DJC).

[2] Memorandum of Law in Support of Defendants' Motion to Compel Product Market Discovery, *In re Asacol Antitrust Litigation* (relating to all actions), United States District Court for the District of Massachusetts, Civil Action No. 1:15-cv-12730 (DJC), November 11, 2016 (hereafter "Defendants' Memorandum").

Actiq,[3] Bextra,[4] Celexa and Lexapro,[5] Bextra, Geodon, Lyrica and Zyvox,[6] Geodon,[7] Ketek,[8] Lupron,[9] Neurontin,[10] Nexium,[11] Premarin, Prempro and Premphase,[12] Risperdal,[13] Rituxan,[14] Vioxx[15] and Zyprexa.[16]  I have submitted written testimony in litigation concerning alleged

---

[3]  *In re:  Actiq Sales and Marketing Practices Litigation*, United States District Court for the Eastern District of Pennsylvania, No. 07-CV-4492.

[4]  *In re:  Bextra Marketing Sales Practices and Product Liability Litigation*, United States District Court for the Northern District of California, MDL No. 1699, No. M:05-CV-01699-CRB.

[5] *In re:  Celexa and Lexapro and Sales Practices Litigation*, United States District Court for the District of Massachusetts, Case No. 09-MD-2067 (NMG); MDL No. 2067.

[6] *Mary K. Jones v. Pfizer Inc., et al.*, United States District Court for the Southern District of New York, Civil Action No. 1:10-cv-03864-AKH.

[7] *In re United States of America v. Pfizer, Inc.*, United States District Court for the District of Massachusetts, Case No. 1:10-CV-11166-DPW.

[8]  *Sergeants Benevolent Association Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, United States District Court for the Eastern District of New York, No. 08-CV-179.

[9]  *In re:  Lupron Marketing and Sales Practices Litigation*, United States District Court for the District of Massachusetts, MDL No. 1430, No. 01-CV-10861.

[10]  *In re:  Neurontin Marketing and Sales Practices Litigation*, United States District Court for the District of Massachusetts, MDL No. 1629, No. 04-10981; *Gregory Clark and Linda Meashey v. Pfizer Inc., and Warner-Lambert Company, LLC*, Philadelphia County Court of Common Pleas, No. 1819; *Elizabeth Judy and Stephen Brown v. Pfizer, Inc. individually and as successor in interest to Parke-Davis and Warner-Lambert, Inc.*, Circuit Court of the City of St. Louis, State of Missouri, Cause No. 042-01946, Division No. 1; and *In re: Neurontin Marketing and Sales Practices Litigation*, as it relates to: *Kaiser Foundation Health Plan v. Pfizer, Inc.*, United States District Court for the District of Massachusetts, MDL No. 1629, No. 04-10981-PBS, No. 04-10739-PBS.

[11]  *Commonwealth Care Alliance and Glen Crenshaw v. AstraZeneca Pharmaceuticals L.P. and Zeneca Holdings, Inc.*, Commonwealth of Massachusetts, Superior Court, Trial Court Department, No. 05-CV-0269 BLS.

[12]  *Krueger v. Wyeth, Inc.*, United States District Court for the Southern District of California, Civil Action No. 03CV2496 JAH (AJB).

[13]  *Charles Foti, Attorney General ex rel. State of Louisiana v. Janssen Pharmaceutica, Inc.*, 27th Judicial District Court, Parish of St. Landry, No. 04-C-3967-D and *The State of Texas, ex rel. Allen Jones v. Janssen, L.P.*, District Court, 250th Judicial District, Travis County, Texas, No. D-1GV-04-001288.

[14]  *United States ex rel. John Underwood v. Genentech, Inc.*, United States District Court for the Eastern District of Pennsylvania, No. 03-CV-3983.

[15]  *Kleinman v. Merck & Co.*, No. ATL-L-3954-04 and *Martin v. Merck & Co.*, No. ATL24-05, Superior Court of New Jersey, Law Division, Camden County.

[16]  *In re:  Zyprexa Products Liability Litigation*, United States District Court for the Eastern District of New York, MDL No. 1596, Civil Action No. 05-CV-4115. I also submitted testimony in related state matters.

---

foreclosure of generic entry for the following drugs: Augmentin,[17] AndroGel,[18] Prograf,[19] Wellbutrin SR,[20] Wellbutrin XL,[21] Flonase,[22] Nexium,[23] Skelaxin[24] and Solodyn.[25]  I have submitted written and presented oral testimony in litigation alleging the fraudulent use of list prices (AWP) in pharmaceutical pricing.[26]  In addition, I have consulted to GMA on litigation in other pharmaceutical matters, such as litigation related to the following drug products: K-Dur, Cardizem CD, Hytrin, BuSpar, Relafen, Cipro, lorazepam and clorazepate, and Taxol.[27]

---

[17] *In re:  Augmentin Antitrust Litigation*, United States District Court for the Eastern District of Virginia, No. 02-CV-442.

[18] *Health Net, Inc. v. Solvay Pharmaceuticals, Inc. and Unimed Pharmaceuticals, Inc*., United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:11-CV-0334.

[19] *In re:  Prograf Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2242, Master File No. 1:11-CV-2242-RWZ.

[20] *In re:  Wellbutrin SR Antitrust Litigation*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 04-CV-5898.

[21] *Plumbers and Pipefitters Local 572 Health and Welfare Fund, et. al. v. Biovail Corporation, Biovail Laboratories, Inc., Biovail Laboratories International SRL, and Smithkline Beecham D/B/A Glaxosmithkline, PLC*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 08-CV-2433-MAM.

[22] *American Sales Company, Inc. v. Smithkline Beecham Corporation D/B/A GlaxoSmithKline, Plc.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2:08-CV-03149.

[23] *In re:  Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409, Civil Action No. 112-CV-11711 and *In re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2406, Civil Action No. 1:12-md-2409-WGY.

[24] *In re:  Skelaxin (Metaxalone) Antitrust Litigation*, The United States District Court for the Eastern District of Tennessee, Lead No. 2:12-CV-83, MDL. No. 2343

[25] *In re: Solodyn (Minocycline Hydrochloride) Antitrust Litigation* (relating to all actions), MDL No. 2503, 1:14-MD-2503-DJC.

[26] *In re:  Pharmaceutical Industry Average Wholesale Price Litigation,* United States District Court for the District of Massachusetts, MDL, No. 1456, Civil Action No. 01-CV-12257-PBS.

[27] *In re:  K-Dur Antitrust Litigation*, United States District Court for the District of New Jersey, Civil Action No. 01-1652 (JAG), (Consolidated Cases), MDL No. 1419; *In the Matter of Hoechst Marion Roussel, Inc., Carderm Capital L.P., and Andrx Corporation*, United States of America Before Federal Trade Commission, Docket No. 9293; *In re Terazosin Hydrochloride Antitrust Litigation*, United States District Court for the Southern District of Florida, No. 99-MDL-1317 Seitz/Garber; *In re: Buspirone Antitrust Litigation*, United States District Court for the Southern District of New York, MDL No. 1413; *In re Relafen Antitrust Litigation,* United States District Court for the District of Massachusetts, Master File No. 01-CV-12222-WGY; *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, United States District Court for the Eastern District of New York, Master File No. 1:00-MD-1383; *In re Lorazepam and Clorazepate Antitrust Litigation*, United States District Court for the District of Columbia, MDL No. 1290; and *HIP Health Plan of Florida, Inc., on Behalf of Itself and All Others Similarly Situated v. Bristol-Myers Squibb Co. and American Bioscience*, United States District Court for the District of Columbia, Civil Action No. 1:01CV01295.

---

3.      I have offered opinions on market definition, market power and relevant markets several times.[28]  To my knowledge, my opinions in these matters have never been rejected by the court. I testified at trial in the Nexium matter regarding market definition before Judge Young in the District of Massachusetts.

4.      I have conducted research on a wide variety of health economics topics, with a focus on the financing and organization of the U.S. health care system. Specific topics I have studied include the effect of payment incentives on provider behavior,[29] payment and delivery system reform,[30] and advertising of prescription drugs.[31] I have published numerous peer-reviewed journal articles, essays, and book chapters.

5.      I received an A.B. in International Relations from Brown University in 1990 and a Ph.D. in Health Policy (Economics Track) from Harvard University in 1998. A more complete description of my qualifications is found in my *Curriculum Vitae*, which is included as Attachment A to this Declaration.

6.      The consulting company that I am affiliated with, Greylock McKinnon Associates (GMA), is currently compensated at a rate of $650 per hour for my time.  I received assistance with the preparation of this report from other professionals at GMA with rates that range from $225 to $675 per hour. The compensation due to GMA is for the work performed and it is not

---

[28]  See cases identified in footnotes 18, 21, 23 and 25 above.

[29]  See M. Rosenthal, "Risk Sharing and the Supply of Mental Health Services," *Journal of Health Economics*, 19(6), November 2000, pp. 1047-65; M. Rosenthal, R. Frank, Z. Li, and A. Epstein, "From Concept to Practice: Early Experience with Pay-for-Performance," *JAMA*, 294(14), October 2005, pp. 1788-93; and M. Rosenthal, Z. Li, A. Robertson, and A. Milstein, "Impact of Financial Incentives for Prenatal Care on Birth Outcomes and Spending," *Health Services Research*, 44(5 Pt 1), October 2009, pp. 1465-79.

[30]  See M. Rosenthal, "Beyond Pay for Performance: Emerging Models of Provider-Payment Reform," *New England Journal of Medicine*, 359(12), September 2008, pp. 1197-1200; M. Rosenthal, M. Friedberg, S. Singer, D. Eastman, Z. Li, and E. Schneider, "Effect of a Multipayer Patient-Centered Medical Home on Health Care Utilization and Quality: The Rhode Island Chronic Care Sustainability Initiative Pilot Program," *JAMA Internal Medicine*, September 2013, PMCID: 24018613; and S. Edwards, M. Abrams, M. Rosenthal, *et al.*, "Structuring Payment to Medical Homes After the Affordable Care Act," *Journal of General Internal Medicine*, 2014, PMCID: 417661.

[31]  M. Rosenthal, *et al.*, "Promotion of Prescription Drugs to Consumers," *New England Journal of Medicine*, 346(7), February 2002, pp. 498-505; M. Rosenthal, *et al.*, "Demand Effects of Recent Changes in Prescription Drug Promotion," *Forum for Health Economics & Policy*, 6(1), January 2003, pp. 1-26; M. Mello, M. Rosenthal, and P. Neumann, "Direct-to-Consumer Advertising and Shared Liability for Pharmaceutical Manufacturers," *JAMA*, 289(4), January 2003, pp. 477-81; J. Donohue, E. Berndt, M. Rosenthal, A. Epstein, and R. Frank, "Effects of Pharmaceutical Promotion on Adherence to the Treatment Guidelines for Depression," *Medical Care*, 42(12), December 2004, pp. 1176-85.

contingent upon my opinions, my conclusions, or the outcome of this matter. The opinions I state in this report are stated within a reasonable degree of professional certainty. I reserve the right to respond to, rebut, opine on, or incorporate any opinions offered by other experts in this case.

## II.    BACKGROUND, SUMMARY OF ASSIGNMENT

7.     I have been asked by counsel for the DPPs and EPPs in this matter to review and to comment on the defendants' memorandum of law to compel discovery from selected Plaintiffs.[32] I have been asked to conduct my review of the content of the memorandum with the primary purpose of determining whether the information sought by the defendants is relevant for an economist to draw meaningful conclusions regarding the definition of the antitrust market relevant for proper analysis of the unlawful conduct alleged in this matter. The motion asks the Court to compel plaintiffs to produce materials relating to nine ulcerative colitis drugs in addition to Asacol, Asacol HD and Delzicol.[33]

8.     Having reviewed the motion to compel, the facts and allegations in this matter, and the information used to properly identify and measure the scope of a relevant antitrust market, I conclude that the materials subject to the motion are irrelevant to a determination of the antitrust market relevant to the unlawful conduct alleged in this matter.

## III.    MARKET-WIDE ANALYSIS IS NECESSARY FOR THE DETERMINATION OF A RELEVANT ANTITRUST MARKET

9.     The correct definition of the boundaries of an antitrust market relevant to the analysis of any specific economic activity or arrangement (*e.g.*, a merger, an agreement to forestall entry, a price-fixing conspiracy, an alleged monopolization, etc.) requires a careful investigation into product substitution and product switching at the level of the entire market. Market-wide data are necessary because the behavior of individual market participants cannot be used to measure the extent to which substitution puts downward pressure on a firm's pricing strategy. It is only

---

[32] Defendants' Memorandum.

[33] *Ibid.*, p. 1.

by estimating aggregate patterns of substitution in the face of relative price changes that an economist can accurately describe the price responsiveness of a product in relation to others and therefore market power and market definition.

10. Defendants' motion to compel focuses upon data for *individual* entities, *not the market as a whole*. These plaintiffs do not constitute the entirety of the purchasers and sales in the antitrust market that must be defined here; they represent only a portion of the purchasers and sales. Focusing upon them alone for purposes of defining the antitrust market relevant here is insufficient, incomplete, and potentially misleading. As discussed below, the determination of the correct antitrust market must be conducted using market-wide data, such as IMS data or transactional data maintained by the defendants themselves. Such market-wide data contain the sales for each of these plaintiffs. In addition, the discovery materials from defendants will measure and quantify the amount and timing of the rebate strategies implemented for the market as a whole. Using these materials from defendants, an economist can assess the impact of these price-offset strategies upon market-wide sales quantities and prices in the context of the *Guidelines* as discussed below. Obtaining similar materials from a few market participants would be insufficient.

## IV. DETERMINATION OF MARKET DEFINITION

11. As noted above, the definition of a relevant antitrust market is undertaken on a market-wide basis. Notably, it may not always be necessary to define a relevant market in order to determine whether a defendant has substantial market power as such power can be observed directly, for example through evidence of costly efforts to exclude competition or evidence of prices far above marginal costs. However, in those instances where it is necessary or appropriate to define a relevant market to evaluate market power indirectly rather than directly, it must be done using market-wide data as discussed above.

12. The primary touchstone for market definition, properly applied, is the Horizontal Merger Guidelines (the "*Guidelines*"), developed by the Department of Justice (DOJ) and the Federal

Trade Commission (FTC).[34]  The *Guidelines* provide a conceptual basis for identifying the scope of markets relevant to antitrust analysis and a precise methodology for establishing the boundaries of such markets.  Although they were developed for the original purpose of evaluating horizontal mergers, these guidelines correspond to generally accepted economic principles and have been applied and accepted in antitrust matters such as this one.  This is because the essence of a merger is to reduce the number of independent competitors in a market.  Such an economic impact can be accomplished not only through ownership but also through foreclosure.  In principal, raising barriers to entry of any kind, including the misconduct alleged in this matter, could cause a reduction in competition and thereby cause prices to be above normal (competitive) levels.

13.     Specifically, two products occupy the same antitrust market if the market-wide increase of the price of one of the products is constrained by consumer substitution to the other product.  For example, if Producer A raises the price of its Product A by a small but significant amount above the competitive price level, say 5%, and market-wide substitution away from A to Product/Producer B makes that price increase unprofitable for A, such substitution *constrains* the pricing of A.  That constraint means that B is in the same antitrust market as A.  Then suppose a third product, Product C, is hypothesized to be in the same antitrust market as A and B.  If, however, it is observed that an increase of the prices of Products A and B (where Producers A and B are assumed to constitute the Hypothetical Monopolist) from a competitive level by that same small but significant amount (5%) does not reduce market-wide product sales to an extent that it is unprofitable to A and B, then that third product, C, does not occupy the same antitrust market as A and B.

14.     The 1992 *Guidelines* have been the basis for determination of relevant antitrust markets through their recent revision in August 2010.  The analytic content and approach are substantially the same in both versions.

---

[34]  United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, April 2, 1992, and revised August 19, 2010.  I note that the *1992 Guidelines* were revised periodically between 1992 and 2010; here I cite the version revised April 8, 1997.

15.     In order to define and measure the size of the antitrust market subject to scrutiny, the *Guidelines* propose the "Hypothetical Monopolist Test," which is implemented as follows:[35]

> A market is defined as a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and nontransitory' increase in price [SSNIP], assuming the terms of sale of all other products are held constant.

> [To implement this definition], the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and nontransitory' increase in price, but the terms of sale of all other products remained constant. If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next-best substitute for the merging firm's product. … This process will continue until a group of products is identified such that a hypothetical monopolist over that group of products would profitably impose at least a 'small but significant and nontransitory' increase. … The Agency generally will consider **the relevant product market to be the smallest group of products that satisfies this test**.

16.     Moreover, the *Guidelines* state that "Once defined, a relevant market must be measured in terms of its participants and concentration."[36] The 1992 *Guidelines* take "small but significant" to be 5%. "Nontransitory" is usually taken to be one year.[37] The 2010 *Guidelines* likewise propose a 5% increase. This analysis is often referred to as the SSNIP test.[38]

17.     The analysis and the implementation of the Hypothetical Monopolist Test, and any related analytic efforts, must be conducted *market-wide*.[39] For the simplified example above, the analysis must account for all Producers A, B, and C of Products A, B and C. Likewise, the

---

[35] *1992 Guidelines*, §§ 1.0 and 1.11, emphasis added. The *2010 Guidelines* use the same Hypothetical Monopolist Test (see § 4.1.1).

[36] *1992 Guidelines*, § 1.

[37] *1992 Guidelines*, § 1.11: "In attempting to determine objectively the effect of a 'small but significant and nontransitory' increase in price, the Agency, in most contexts, will use a price increase of five percent lasting for the foreseeable future."

[38] *2010 Guidelines*, § 4.1.2: "The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value."

[39] *1992 Guidelines*, § 1.3.

analysis and implementation must include the economic decisions and behavior of all purchasers/payors. Analysis of the economic behavior of some subgroup of producers and/or some subgroup of purchasers/payors will be insufficient to characterize the switching and substitution behavior of the aggregation of all market participants – the "market" as a whole. Such limited analysis may produce biased and incorrect conclusions regarding market definition.

18.     As the *Guidelines* make clear, the determination of the contours of a relevant antitrust market is a data driven process. The analysis focuses on *economic* behavior. Does a change in the price of one product affect the volume of units sold of another product? If so, by how much? Wholesaler or PBM contracts, formularies, marketing plans, or anecdotal assessments of therapeutic interchangeability from a limited number of plaintiffs are insufficient to determine the market-wide effects of price changes on the quantities of potentially alternative products demanded. Aggregate data available (*e.g.*, from IMS Health) provide the types of information relied upon by economists in properly performing a relevant market analysis. Similarly, information describing the subjective views or behavior of a single or subset of market participants is not appropriate to the analytic approach the *Guidelines* require.

## V.     AVAILABILITY OF AGGREGATE DATA TO CHARACTERIZE THE RELEVANT MARKET

19.     A rich source of aggregate data exists to address market definition (as well as impact and damages). These data contain information on the market clearing prices and quantities sold, and changes both in response to price increases and market entry (*i.e.*, the consideration of possible additional candidates for inclusion in the antitrust market). That source is the widely used data collected by IMS Health, which summarizes sales and prices at wholesale (the National Sales Perspective (NSP) data product) and at retail (the National Prescription Audit (NPA) data product).[40] These data, which leverage transactional data on the majority of pharmaceutical sales to generate market-wide estimates, are used extensively by industry participants, governmental research, academic research (including research conducted by me) and in litigation. The IMS

---

[40] The NSP data is a sample gathered from wholesalers and manufacturers and summarizes nearly 100% of wholesale transactions. The NPA sample data are drawn from retailers and summarize approximately 70% of all transactions.

data are considered the gold standard of data for analysis of pharmaceutical product markets. Further, these data are easily obtainable from IMS.

20.     Market-wide data on manufacturer sales, discounts, rebates and coupon values are maintained by the defendants.  The hypothesized impact of these economic variables on product switching and substitution can be measured and analyzed at the aggregate market wide level, which is the correct analytic platform.  These data are widely used when defining the antitrust market relevant to economic conduct in pharmaceutical product markets.  For market definition, these aggregate third party data may be enriched with selected relevant data and information from the defendants including, as noted above, data on rebates and discounts.

## VI.   CONCLUSIONS

21.     Defendants' motion to compel focuses upon documents and data for *individual* entities, not the market as a whole.  These plaintiffs do not constitute the entirety of the purchasers and sales in the antitrust market that must be defined here; they represent only a small portion of the purchasers and sales.  Focusing upon them alone for purposes of defining the antitrust market relevant here is insufficient, incomplete, and potentially misleading.  As discussed above, the determination of the correct antitrust market must be conducted using market-wide data, such as IMS data or transactional data maintained by the defendants themselves.  Such market-wide data contain the sales for each of these plaintiffs.  Obtaining similar materials from a few market participants simply makes no sense given that market-wide data are available.  Defendants' motion to compel does not identify any economically reliable method in which the data requested from plaintiffs can be used to define a relevant antitrust market in this case, and I am not aware of any such method.

22.     In conclusion, the data requested by defendants are neither useful nor sufficient for establishing market definition on a Class-wide basis in this case.  The accepted methodology for analyzing market definition requires the use of market-wide data, not data for individual market entities.  The same transactions that would be the subject of the data demanded by defendants are covered by market-wide data sources (such as IMS Health and the defendants' own data).  These market-wide data sources include not only the data requested by defendants but also sales for the rest of the market.

Meredith Rosenthal
November 28, 2016

**Attachment A**

## CURRICULUM VITAE

Date: November, 2016

**NAME:**            Meredith B. Rosenthal

**ADDRESS:**       Harvard T. H. Chan School of Public Health.
                           677 Huntington Avenue
                           Boston, MA 02115
                           Tel: (617) 432-3418
                           meredith_rosenthal@harvard.edu

**BIRTHPLACE:**   Boston, Massachusetts

## EDUCATION:

1990          International Relations (Commerce), A.B., Brown University

1998          Health Policy (Economics track), Ph.D., Harvard University

## ACADEMIC APPOINTMENTS:

2011-          Professor of Health Economics and Policy
                   Department of Health Policy and Management
                   Harvard School of Public Health

2006-2011    Associate Professor of Health Economics and Policy
                   Department of Health Policy and Management
                   Harvard School of Public Health

1998-2006    Assistant Professor of Health Economics and Policy
                   Department of Health Policy and Management
                   Harvard School of Public Health

## ADMINISTRATIVE APPOINTMENTS:

2013-          Associate Dean for Diversity
                   Harvard T. H. Chan School of Public Health

## PROFESSIONAL SOCIETIES:

2014-present   Elected Member, National Academy of Medicine (Institute of Medicine)

2004-present   American Society of Health Economists

2000-present   International Health Economics Association

1995-present   AcademyHealth
                       *Planning Committee for 2008 Annual Research Meeting*

**OTHER PROFESSIONAL EXPERIENCE:**

| | |
|---|---|
| 1993-1994 | Analyst, Health Economics Research, Inc./The Center for Health Economics Research |
| 1990-1993 | Consultant, Price Waterhouse, Tax Economics Department |

**SERVICE:**

| | |
|---|---|
| 2013-present | Board Chair, Massachusetts Health Quality Partners |
| 2007-present | Member, Massachusetts Public Health Council |
| 2005 | Expert Testimony, House Committee on Education and Workforce, House Subcommittee on Employer-Employee Relations, Hearing on Examining Pay-for-Performance Measures and Other Trends in Employer-Sponsored Health Care |
| 2003 | Expert Testimony, Senate Special Committee on Aging, Hearing on Direct to Consumer Advertising of Prescription Drugs: Exploring the Consequences |
| 2001 | Chair, Massachusetts Special Commission on Physician Compensation |

**HONORS AND DISTINCTIONS:**

| | |
|---|---|
| 2006 | Alfred P. Sloan Foundation Industry Studies Fellowship |
| 2003 | Labelle Lectureship in Health Policy, McMaster University |
| 2010 | Academy of Management Best Theory to Practice Paper in Health Care Management |
| 2011 | Harvard School of Public Health Teaching Citation |
| 2014 | Harvard School of Public Health Junior Faculty Mentoring Award |
| 2015 | Harvard TH Chan School of Public Health Advancement of Women Faculty Mentoring Award |
| 2016 | Harvard TH Chan School of Public Health Student Mentoring Award |
| 2016 | AcademyHealth Paper of the Year Award |

**MAJOR ADMINISTRATIVE RESPONSIBILITIES:**

| | |
|---|---|
| 2012-2014 | HSPH Faculty Council, Vice-Chair (2012) |
| 2007-2014 | HSPH Committee on Admissions and Degrees, Chair (2010) |
| 2007 | C-Chair, HSPH Child Care Task Force |

2006-2011    HSPH Committee on the Concerns of Women Faculty

2000-present  Executive Committee on Higher Degrees in Health Policy, Harvard University

1999-present  Admissions Committee, Ph.D. Program in Health Policy, Harvard University

## EDITORIAL ACTIVITIES:

2012-2015    Member, *New England Journal of Medicine*, Perspective Advisory Board

1997-present  Referee: *Journal of Health Economics*, *Inquiry*, *Health Services Research, Health Affairs, Journal of the American Medical Association, New England Journal of Medicine, and others*

2008-2014    Associate Editor, Medical Care, Research and Review

1997-1998    Assistant Editor, Evidence-based Health Policy and Management

## MAJOR RESEARCH INTERESTS:

1. Market-oriented health policy
2. Physician payment incentives
3. Consumerism and consumer-directed health plans
4. Economics of the pharmaceutical industry

## RESEARCH SUPPORT:

Past Funding:

2013-2015    Understanding the Use and Impact of Price Data in Health Care, RWJF, *Co-Investigator*

2013-2015    Impact of Price Transparency Tools on Consumer Behavior, RWJF, *Co-Investigator*

2013-2015    Getting the Complete Picture: What does the Body of Research on the Patient-Centered Medical Home Really Tell us? CMWF, *Principal Investigator*

2013-2015    Prevalence and variation in over-use of health services in commercially insured patients, Peter G. Peterson Foundation, *Principal Investigator*

2013-2015    Measuring Overuse of Health Care: Are Providers and Patients 'Choosing Wisely'?, CMWF, *Co-investigator*

2012-2015    Evaluating Sequential Strategies to Reduce Readmission in Diverse Population, AHRQ, *Co-investigator*

| 2010-2014 | Factors Associated with Effective Implementation of a Surgical Safety Checklist, AHRQ (R18), *Co-investigator* |
|---|---|
| 2010-2014 | A Randomized Trial of Behavioral Economic Interventions to Reduce CVD Risk, NIA (RC4), *Co-investigator* |
| 2013-2014 | Prevalence and variation in over-use of health services in Medicare: Choosing Wisely, RWJF, *Co-investigator* |
| 2008-2010 | Rewarding Quality Diabetes Management, RWJF/Hudson Health Plan, *Principal Investigator* |
| 2008-2009 | Effects of High-Deductible Health Plans on Families with Chronic Conditions, RWJF/Harvard Pilgrim Healthcare Plan, *Co-Investigator* |
| 2008-2008 | Implications of Value-Based Purchasing for Health Disparities: A Synthesis of the Evidence, Office of Minority Health, Department of Health & Human Services, *Principal Investigator* |
| 2008-2008 | Payment Reform Opportunities for Medicaid Programs, University of Pittsburgh, *Principal Investigator* |
| 2007-2009 | Changes in Health Care Financing and Organization:  How does Fragmentation of Care Contribute to the Costs of Care? RWJF/HCFO, *Co-investigator* |
| 2006-2008 | Evaluating the Impact of a Novel Pay for Performance Program in a Medicaid Managed Care Plan, The Commonwealth Fund, *Principal Investigator* |
| 2006-2008 | Sloan Industry Studies Fellowship for Meredith Rosenthal, Alfred P. Sloan Foundation, *Principal Investigator* |
| 2005-2008 | Incentive Formularies and the Costs and Quality of Care, Agency for Healthcare Research and Quality, *Co-investigator* |
| 2005-2007 | Strategies to Improve the Value of Health Benefit Spending for Low-Wage Workers, The Commonwealth Fund, *Principal Investigator* |
| 2005–2007 | Uptake and Impact of Health Risk Appraisals, RWJ Health Care Financing and Organization Initiative, *Principal Investigator* |
| 2003-2007 | The Patterns and Impact of Value Based Purchasing, Agency for Healthcare Research and Quality, *Co-investigator* |
| 2002-2007 | Coverage, Organization of Care, and Colorectal Screening,  National Institutes of Health, *Co-investigator* |

## Current Funding

| 2016-2017 | Physician Payment in ACOs, Arnold Foundation, *Principal Investigator* |
|---|---|

2016-2018     Generic Drug Pricing: Actionable Research for Policy, Commonwealth Fund, *Principal Investigator*

2015-2017     Improving the Value of Health Care Choices, Arnold Foundation, *Principal Investigator*

2015-2020     Accelerating the Use of Evidence-based Innovations in Healthcare Systems, AHRQ, *Principal Investigator*

2012-2017     Optimizing Ambulatory Patient Safety in Partnership with Primary Care Transformation, HMS Gift/CRICO, *Co-Principal Investigator*

## TEACHING EXPERIENCE

2016-           Health Policy and Management 260: Health Economics with Applications to Global Health Policy

2003-present  Health Policy and Management 209: Economics for Health Policy

2013-2014     Global Health and Health Policy 50 (Harvard College): The Quality of Care in the United States

1999-2001     Health Policy and Management 507: Mental Health Economics and Policy in the United States

## BIBLIOGRAPHY

### Peer-Reviewed Articles

1. **Rosenthal MB**, Geraty RD, Frank RG, and Huskamp HA. Psychiatric provider practice management companies: adding value to behavioral health? Psychiatric Services, 1999 August; 50(8):1011-13.

2. **Rosenthal MB**. Risk sharing and delegation in managed behavioral health care. Health Affairs, 1999 Sept/Oct; 18(5):204-13.

3. Huskamp HA, **Rosenthal MB**, Frank RG, Newhouse JP. The Medicare prescription drug benefit: How will the game be played? Health Affairs, 2000 March/April; 19(2):8-23.

4. **Rosenthal MB**. Risk sharing and the supply of mental health services. *Journal of* Health Economics, 2000 Nov; 19(6):1047-65.

5. Cutler DM, Epstein AM, Frank RG, Hartman RS, King C, Newhouse JP, **Rosenthal MB**, and Vigdor ER. How good a deal was the tobacco settlement? Assessing payments to Massachusetts. Journal of Risk and Uncertainty, 2000; 21(2/3):235-61.

6. **Rosenthal MB**, Landon BE, Huskamp HA. Managed care and the role of physician organizations in four markets, Health Affairs, 2001 Sept/Oct; 20(5):187-93.

7. **Rosenthal MB**, Frank RG, Buchanan JL, and Epstein AM. Scale and structure of capitated physician organizations in California, *Health* Affairs, 2001; 20(4):109-119.

8. Frank, Richard G., and **MB Rosenthal**. "Health plans and selection: formal risk adjustment vs. market design and contracts." INQUIRY: The Journal of Health Care Organization, Provision, and Financing, 2001; 38(3):290-298.

9. Cutler DM, Gruber J, Hartman RS, Landrum ME, Newhouse JP and **Rosenthal MB.** The economic impacts of the tobacco settlement, Journal of Policy Analysis and Management, 2001 Winter; 21(1):1-19.

10. **Rosenthal MB** and Newhouse JP. Managed care and efficient rationing, Journal of Health Care Finance, 2002 Summer; 28(4):1-10.

11. **Rosenthal MB**, Berndt ER, Frank RG, Donohue JM, and Epstein AM. Promotion of prescription drugs to consumers, New England Journal of Medicine, 2002 Feb; 346(7):498-505.

12. **Rosenthal MB**, Frank RG, Buchanan JL, and Epstein AM. Transmission of financial incentives to physicians by intermediary organizations in California, Health Affairs, 2002 July-August; 21(4):197-205.

13. Mello M, **Rosenthal MB**, and Neumann PJ. Direct-to-consumer advertising and shared liability for pharmaceutical manufacturers, JAMA, 2003 Jan; 289(4):477-81.

14. **Rosenthal MB**, Fernandopulle R, Song HR, and Landon BE. Paying for quality: providers' incentives for quality improvement, Health Affairs, 2004 March-April; 23(2):127-41.

15. **Rosenthal MB**, Hsuan C. and Milstein A. Awakening consumer stewardship of health benefits: prevalence and differentiation of new health plan models. Health Services Research, 2004 August; 39(4): 1055-70.

16. Donohue JM, Berndt ER, **Rosenthal MB**, Epstein AM, and Frank RG. Effects of pharmaceutical promotion on adherence to guideline treatment of depression. Medical Care, 2004 Dec; 42(12):1176-85.

17. **Rosenthal MB**. Doughnut-hole economics. Health Affairs, 2004 Nov-Dec; 23(6):129-35.

18. **Rosenthal MB**, Frank RG, Li Z, and Epstein AM. From concept to practice: early experience with pay-for-performance. JAMA, 2005; 294(14):1788-93.

19. **Rosenthal MB**, Hsuan C. and Milstein A. A report card on the freshman class of consumer-directed health plans. Health Affairs, 2005 Nov;-Dec; 24(6):1592-1600.

20. **Rosenthal MB**, Newhouse JP, and Zaslavsky AM. The geographic distribution of physicians revisited. Health Services Research, 2005 Dec; 40(6):1931-52.

21. **Rosenthal MB**, Minden S, Manderscheid R, Henderson S. A typology of organizational and contractual arrangements for purchasing and delivery of behavioral health care. Administration and Policy in Mental Health, 2006 Dec; 33.4:461-469.

22. **Rosenthal MB** and Frank RG. What is the empirical basis for quality-based incentives in health care? Medical Care Research and Review, 2006 April; 63(2):135-57.

23. **Rosenthal MB** and Daniels NB. Beyond competition: the normative implications of consumer-driven health plans. Journal of Health Politics, Policy, and Law, 2006; 31(3):671-86.

24. **Rosenthal MB**, Landon BE, Normand S-LT, Frank RG, Epstein AM. Pay for performance in commercial HMOs. New England Journal of Medicine, 2006 Nov; 355(18):1895-1902.

25. Mehrotra A, Epstein AM, **Rosenthal MB**. Do integrated medical groups provide higher quality care than IPAs? Annals of Internal Medicine, 2006 Dec; 145:826-33.

26. Landon BE, **Rosenthal MB**, Normand S-LT, Spettell C, Lessler A, Underwood HR, Newhouse JP. Incentive formularies and changes in prescription drug spending. American Journal of Managed Care, 2006 June; 13(6):360-69.

27. Donohue JM, Cevasco M, **Rosenthal MB**. A decade of broadcast advertising of prescription drugs. New England Journal of Medicine, 2007 Aug; 357(7):673-81.

28. **Rosenthal MB**. Pay for performance and beyond. Expert Review of Pharmacoeconomics and Outcomes Research, 2007 Aug; 7(4):351-6.

29. **Rosenthal MB**, Landon BE, Song HR, Howitt K, Epstein AM. Climbing up the pay-for-performance learning curve: Where are the early adopters now? Health Affairs, 2007 Nov-Dec; 26(6):1674-82.

30. **Rosenthal MB**, Landon BE, Normand S-LT, Frank RG, Ahmad TS, Epstein AM. Employers' use of value-based purchasing strategies. Journal of the American Medical Association, 2007 Nov; 298(19):2281-8.

31. **Rosenthal MB**, Landrum MB, Meara E, Huskamp HA, Keating NL. Using performance data to identify preferred hospitals. Health Services Research, 2007 Dec; 42(6):2109-19.

32. Timbie JW, Newhouse JP, **Rosenthal MB**, S-LT Normand. A cost-effectiveness framework for profiling the value of hospital care. Medical Decision Making, 2008 May-Jun; 28(3):419-34.

33. Landon BE, **Rosenthal MB**, Normand SL, Frank RG, Epstein AM. Quality monitoring and management in commercial health plans. American Journal of Managed Care, 2008 Jun; 14(6):377-86.

34. Meara E, **Rosenthal MB**, Sinaiko A, Baicker K. State and Federal approaches to health reform: What works for the working poor? Forum for Health Economics and Policy, 2008 July; 10(1).

35. Mello MM, **Rosenthal MB**. Wellness programs and "lifestyle discrimination"- the legal limits. New England Journal of Medicine, 2008 July; 359(2):192-9.

36. Camillus JA, **Rosenthal MB**. Health care coalitions: from joint purchasing to local health reform. Inquiry, 2008 Summer; 45(2):142-52.

37. **Rosenthal MB**, DeBrantes FS, Sinaiko AD, Frankel M, Robbins RD, Young S. Bridges to excellence: recognizing high quality care. American Journal of Managed Care, 2008 Oct; 14(10):670-78.

38. Schneider EC, **Rosenthal MB**, Gatsonis CG, Zheng J, Epstein AM**.** Is the type of Medicare insurance associated with colorectal cancer screening prevalence and selection of screening strategy? Medical Care, 2008 Sept; 46(9):S84-90.

39. Lee SB, **Rosenthal MB.** Patients with multiple chronic conditions do not receive lower quality of preventive care. Journal of General Internal Medicine, 2008 Dec; 23(12):1933-9.

40. Timbie JW, Shahian DM, Newhouse JP, **Rosenthal MB**, S-LT Normand. Profiling units on the basis of multiple measures: assessing the quality of hospital CABG surgery using quality-adjusted life years. Statistics in Medicine, 2009 Jan; 28(8):1238-54.

41. **Rosenthal MB**, Landon BE, Normand S-LT, Ahmad TS, Epstein AM. Engagement of health plans and employers in addressing racial and ethnic disparities in health care. Medical Care Research and Review, 2009 April; 66(2):219-31.

42. DeBrantes FS, D'Andrea G, Rastogi A, **Rosenthal MB**. Should health care come with a warranty? Health Affairs, 2009 July/Aug; 28(4):w678-87.

43. Huskamp HA, **Rosenthal MB**. Health risk appraisals in employer-sponsored insurance: a meaningful way to engage patients? Health Affairs, 2009 Sept/Oct; 28(5):1532-40.

44. **Rosenthal MB**, Li Z, Robertson AD, Milstein A. Impact of financial incentives for prenatal care on birth outcomes and spending. Health Services Research, 2009 Oct; 44(5):1465-79.

45. **Rosenthal MB**, Li Z, Milstein A. Do patients continue to see physicians who are removed from a PPO network? American Journal of Managed Care, 2009 Oct; 15(10):713-9.

46. Bae SJ, **Rosenthal MB.** Pharmaceutical promotion, prior authorisation and the use of erectile dysfunction medications in the US Medicaid population. Journal of Management and Marketing in Healthcare, 2009 November; 2(4):384-400.

47. Mullen K, Frank RG, **Rosenthal MB**. Can you get what you pay for? Pay for Performance and the Quality of Health Care Providers. RAND Journal of Economics, 2010; 41(1):64-91.

48. Sinaiko A, **Rosenthal MB**. Early evidence of consumer experience with a tiered physician network. American Journal of Managed Care, 2010 Feb; 16(2):123-30.

49. Weinick RM, Chien AT, **Rosenthal MB**, Bristol SJ, Salaman J. Hospital executives' perspectives on pay-for-performance and racial/ethnic disparities in care. Medical Care Research and Review, 2010 Jan; 67(5):574-589.

50. Schneider, Eric, Sara J. Singer, Jako Burgers, Mark Friedberg, **MB Rosenthal**, and Lucian Leape. "Medical care research and. Medical Care Research and Review, 2011; 68(1):112-127.

51. Gilfillan RJ, Tomcavage J, **Rosenthal MB**, Davis DE, Graham J, Roy JA, Pierdon SB, Bloom FJ Jr, Graf TR, Goldman R, Weikel KM, Hamory BH, Paulus RA, Steele GD Jr. Value and the medical home: effects of transformed primary care. American Journal of Managed Care, 2010 August; 16(8):607-14.

52. Van Herck P, De Smedt D, Annemans L, Remmen R, **Rosenthal MB**, Sermeus W. Systematic review: effects, design choices, and context of pay-for-performance in health care. BMC Health Services Research, 2010 Aug; 10(1):247.

53. Choudhry NK, **Rosenthal MB**, Milstein A. Basing cost sharing on value: assessing the evidence for value-based insurance design. Health Affairs, 2010 Nov; 29(11)1988-94.

54. Kullgren JT, Galbraith AA, Hinrichsen VL, Miorshnik I, Penfold RB, **Rosenthal MB**, Landon BE, Lieu TA. Health care use and decision-making among lower-income families in high-deductible health plans. Archives of Internal Medicine, 2010; 170(21):1918-1925.

55. Chien AT, Li Z, and **Rosenthal MB**. Improving timely childhood immunizations through pay for performance in Medicaid managed care, Health Services Research, 2010 Dec; 45(6p2):1934-47.

56. Galbraith AA, Ross-Degnan R, Soumerai S, **Rosenthal MB**, Gay C, Lieu TA. Nearly half of families in high-deductible health plans whose members have chronic conditions face substantial financial burden. 58. Health Affairs. 2011 Feb; 30(2):322-31.

57. Galbraith AA, Ross-Degnan R, Abrams A, **Rosenthal MB**, Lieu TA. Use of well-child visits in high-deductible health plans, American Journal of Managed Care, 2010 Nov; 16(11):833-40.

58. Landon BE, **Rosenthal MB**, Normand S-LT, Spettell C, Lessler A, Underwood HR, Newhouse JP. Incentive formularies: changes in prescription drug spending and utilization for three common drug classes. American Journal of Pharmacy Benefits, 2011; 3(3):152-164.

59. Turbyville S, **Rosenthal MB**, Pawlson G, Scholle S. Health plan resource use - bringing us closer to value-based decisions. American Journal of Managed Care, 2011 Jan; 17(1):68-74.

60. Hussey, PS, Ridgely MS, **Rosenthal MB**. "The PROMETHEUS bundled payment experiment: slow start shows problems in implementing new payment models." Health Affairs, 2011: 30(11):2116-2124.

61. Galbraith AA, Soumerai SB, Ross-Degnan D, **Rosenthal MB,** Gay C, Lieu TA. Delayed and forgone care for families with chronic conditions in high-deductible health plans. Journal of General Internal Medicine, 2012 Sep; 27(9):1105-11.

62. Sinaiko AD, Eastman D, **Rosenthal MB.** How report cards on physicians, physician groups, and hospitals can have greater impact on consumer choices. Health Affairs, 2012 Mar; 31(3):602-11.

63. Joynt KE, **Rosenthal MB**. Hospital value-based purchasing: Will Medicare's new policy exacerbate disparities? Circulation: Cardiovascular Quality and Outcomes. 2012 Mar; 5(2):148-9.

64. Conti RM, **Rosenthal MB**, Polite BN, Bach PB, Shis YC. Infused chemotherapy use in the elderly after patent expiration. Journal of Oncology Practice, 2012 May; 8(3):S18-23.

65. Weissman JS, Bailit M, D'Andrea G, **Rosenthal MB**. The design and application of shared savings programs: lessons from early adopters. Health Affairs, 2012 Sep; 31(9):1959-68.

66. Chien AT, Eastman D, Li Z, **Rosenthal MB**. Impact of a pay for performance program to improve diabetes care in the safety net. Preventive Medicine, 2012 Nov; 55:S80-5.

67. Conti RM, Bernstein AC, Villaflor VM, Schilsky RL, **Rosenthal MB**, Bach PB. Prevalence of off-label use and spending in 2010 among patent-protected chemotherapies in a population-based cohort of medical oncologists. Journal of Clinical Oncology, 2013 Mar; 31(9):1134-1139.

68. **Rosenthal MB**, Friedberg MW, Singer SJ, Eastman D, Li Z, Schneider EC. Effect of a multipayer patient-centered medical home on health care utilization and quality: The Rhode Island Chronic Care Sustainability Initiative Pilot Program. JAMA Internal Medicine, 2013; 173(20):1907-13.

69. Friedberg MW, Werner R, Volpp K, **Rosenthal MB**, Schneider EC. Association between participation in a multipayer medical home: intervention and changes in quality, utilization, and costs of care. JAMA, 2014; 311(8):815-825.

70. Alidina S, Schneider EC, Singer SJ, Friedberg MW, **Rosenthal MB**, et al. Practice environments and job satisfaction in patient-centered medical homes. The Annals of Family Medicine, 2014; 12(4):331-337.

71. Clark JL, Miff S, **Rosenthal MB**, et al. Navigating to excellence solutions driving exceptional results. American Journal of Medical Quality, 2014; 29(1):3S-18S.

72. Edwards ST, Abrams MK, **Rosenthal MB**, et al. Structuring payment to medical homes after the Affordable Care Act. Journal of General Internal Medicine, 2014; 29(10):1410-3.

73. Sinaiko AD, **Rosenthal MB**. The impact of tiered physician networks on patient choices. Health Services Research, 2014; 49(4):1348-63.

74. Colla CH, Sequist TD, **Rosenthal MB**, Schpero WL, Gottlieb DJ, Morden NE. Use of non-indicated cardiac testing in low-risk patients: choosing wisely. BMJ: Quality and Safety, 2015; 24(2):149-53.

75. Alidina S, Schneider EC, Singer SJ, Friedberg MW, **Rosenthal MB**. Structural capabilities in small and medium-sized patient-centered medical homes. American Journal of Managed Care, 2014; 20(7):e265-77.

76. Colla, Carrie H; Morden, Nancy E; Sequist, Thomas D; Schpero, William L; **Rosenthal, MB**; Choosing wisely: prevalence and correlates of low-value health care services in the United States. JGIM, 2015; 30(2):221-228.

77. JW Peabody, X Huang, R Shimkhada, **Rosenthal MB**. Managing specialty care in an era of heightened accountability: emphasizing quality and accelerating savings. American Journal of Managed Care, 2015; 21(4):284-292.

78. H Song, AT Chien, J Fisher, J Martin, AS Peters, K Hacker, **MB Rosenthal**, SJ Singer. Development and validation of the Primary Care Team Dynamics Survey. HSR, 2015; 50(3): 897-921.

79. MW Friedberg, **MB Rosenthal**, RM Werner, KG Volpp, EC Schneider. Effects of a medical home and shared savings intervention on quality and utilization of care. JAMA Internal Medicine, 2015; 175(8):1362-1368.

80. Huang, Xiaoyan, **Rosenthal MB**. Overuse of cardiovascular services evidence, causes, and opportunities for reform. Circulation, 2015; 132(3):205-214.

81. **Rosenthal MB**, et al. A difference-in-difference analysis of changes in quality, utilization and cost following the Colorado multi-payer patient-centered medical home pilot. Journal of General Internal Medicine, 2015; 1-8.

82. **Rosenthal MB**, et al. Impact of the Rochester medical home Initiative on primary care practices, quality, utilization, and costs. Medical Care, 2015; 53(11):967-973.

83. Song, H, Ryan M, Tendulkar S, Fisher J, Martin J, Peters AS, Frolkis JP, **Rosenthal MB**, Chien AT, Singer SJ. Team dynamics, clinical work satisfaction, and patient care coordination between primary care providers: A mixed methods study. Health Care Management Review 2016 Jan.

84. Reibling N, **Rosenthal MB**. The (missed) potential of the patient-centered medical home for disparities. Medical Care 2016 54(1):9-16

85. Emanuel EJ, Ubel PA, Kessler JB, Meyer G, Muller RW, Navathe AS, Patel P, Pearl R, **Rosenthal MB**, Sacks L, Sen AP. Using behavioral economics to design physician

incentives that deliver high-value care. *Annals of Internal Medicine.* 2016; 164(2):114-119.

86. **Rosenthal MB**, et al. Impact of the Cincinnati aligning forces for quality multi-payer patient centered medical home pilot on health care quality, utilization, and costs. *Medical Care Research and Review*, 2015; 1077558715618566.

87. **Rosenthal MB**, Landrum ME, Robbins J, Schneider EC. Pay for performance in Medicaid: evidence from three natural experiments. *Health Services Research*, 2015 Dec.

88. Asch, D.A., Troxel, A.B., Stewart, W.F., Sequist, T.D., Jones, J.B., Hirsch, A.G., Hoffer, K., Zhu, J., Wang, W., Hodlofski, A. and Frasch, A.B., Finnerty D, **Rosenthal MB**, Gangemi, K, Volpp KG. 2015. Effect of financial incentives to physicians, patients, or both on lipid levels. A Randomized Clinical Trial. *JAMA*, 314(18), pp.1926-1935.

89. Alidina, S, **Rosenthal MB**, Schneider, EC, Singer SJ. "Coordination within medical neighborhoods: Insights from the early experiences of Colorado patient-centered medical homes. *Health care management review,* 2016.

90. Sinaiko, AD, **Rosenthal MB**. "Examining A Health Care Price Transparency Tool: Who Uses It, And How They Shop For Care. *Health Affairs* 35.4, 2016: 662-670.

91. Shea JA, Adehare A, Volpp KG, Troxel AB, Finnerty D, Hoffer K, Isaac T, **Rosenthal MB**, Sequist TD, Asch DA. Patient's views of a behavioral intervention including financial incentives. *American Journal of Managed Care*, 2016: In Press

92. Colla CH, Kinsella EA, Morden NE, Meyers DJ, **Rosenthal MB**, Sequist TD. Physician perceptions of Choosing Wisely and drivers of overuse. *The American Journal of Managed Care*, 2016 May;22(5):337-43.

93. Frean M., Shelder S., **Rosenthal MB**, Sequist TD, Sommers BD. 2016. Health reform and coverage changes among Native Americans. *JAMA internal medicine*, 176(6), pp.858-860.

94. Enomoto LM, Shrestha DP, **Rosenthal MB**, Hollenbeak CS, Gabbay RA. Risk factors associated with 30-day readmission and length of stay in patients with type 2 diabetes. *Journal of Diabetes and Its Complications*, 2016 October.

95. Emanuel, E.J., Ubel, P.A., Kessler, J.B., Meyer, G., Muller, R.W., Navathe, A.S., Patel, P., Pearl, R., **Rosenthal, M.B.**, Sacks, L. and Sen, A.P., 2016. Using behavioral economics to design physician incentives that deliver high-value care. *Annals of internal medicine*, 164(2), pp.114-119.

96. Sinaiko, A.D., Joynt, K.E. and **Rosenthal, M.B.**, 2016. Association Between Viewing Health Care Price Information and Choice of Health Care Facility. *JAMA Internal Medicine*.

97. Shields, M.C. and **Rosenthal, M.B.**, 2016. Quality of Inpatient Psychiatric Care at VA, Other Government, Nonprofit, and For-Profit Hospitals: A Comparison. *Psychiatric Services*, pp.appi-ps.

98. Peiris, D., Phipps-Taylor, M.C., Stachowski, C.A., Kao, L.S., Shortell, S.M., Lewis, V.A., **Rosenthal, M.B.** and Colla, C.H., 2016. ACOs Holding Commercial Contracts Are Larger And More Efficient Than Noncommercial ACOs. *Health Affairs*, 35(10), pp.1849-1856.

**Essays and Commentary**

1. **Rosenthal MB**. Provider reimbursement in the twenty-first century. Oncology Economics, 2000; 1.

2. **Rosenthal, MB**, et al. "Demand effects of recent changes in prescription drug promotion." Forum for Health Economics & Policy, 2003; 6(1).

3. **Rosenthal MB**. Commentary on: The economics of direct-to-consumer advertising of prescription-only drugs: prescribed to improve consumer welfare? Journal of Health Services Research and Policy, 2003 Oct; 8(4):237-44.

4. **Rosenthal, MB** "How will paying for performance affect patient care?". Virtual Mentor, 2006; 8(3):162-165.

5. **Rosenthal MB**. P4P: Rumors of its demise may be exaggerated. Editorial, American Journal of Managed Care, 2007 May; 13(5):238-9.

6. **Rosenthal MB** and Dudley RA. Pay-for-performance: Will the latest payment trend improve care? Journal of the American Medical Association, 2007 Feb; 297(7):740-43.

7. **Rosenthal MB.** Nonpayment for performance: Medicare refuses payment for some adverse effects of care. New England Journal of Medicine, 2007 Oct; 357(16):1573-5.

8. **Rosenthal, MB** "Avoiding disincentives to treat in designing pay-for-performance measures." Virtual Mentor, 2007; 9(7):483-486.

9. **Rosenthal MB.** Beyond pay for performance: emerging models of provider-payment reform. New England Journal of Medicine, 2008 Sept; 359(12):1197-1200.

10. Lee TH, Mongan JJ, Oberlander J, **Rosenthal MB**. Health care and the recession. (Roundtable) New England Journal of Medicine, 2009 Jan; 360(4):e5.

11. **Rosenthal MB.** What works in market-oriented health policy? New England Journal of Medicine, 2009 May; 360(21):2157-60.

12. Gawande, Atul A., Elliott S. Fisher, Jonathan Gruber, and **Rosenthal MB**. "Perspective Roundtable. The cost of health care--highlights from a discussion about economics and reform." New England Journal of Medicine, 2009 Oct; 361(15):1421-1423.

13. DeBrantes FS, **Rosenthal MB**, Painter M. Building a bridge from fragmentation to accountability -- the prometheus payment model. New England Journal of Medicine, 2009 Sept; 361(11):1033-6.

14. Campbell E, **Rosenthal MB**. Reform of continuing medical education: making the case for investments in physician human capital. Journal of the American Medical Association, 2009 Oct 28; 302(16):1807-8.

15. **Rosenthal MB**, Beckman HB, Dauser Forrest D, Huang ES, Landon BE, Lewis S. Will the patient-centered medical home improve efficiency and reduce costs of care? A measurement and research agenda. Medical Care Research and Review published online on June 2, 2010.

16. Sinaiko A, **Rosenthal MB.** Patients' role in accountable care organizations. New England Journal of Medicine, 2010; 363(27:2583-5.

17. Sinaiko A, **Rosenthal MB.** Increased price transparency in health care — challenges and potential effects. New England Journal of Medicine, 2011 Mar; 364(10):891-4.

18. Lewis, Kristina H., and **MB Rosenthal**. Individual responsibility or a policy solution—cap and trade for the US diet? New England Journal of Medicine, 2011; 365(17):1561-1563.

19. **Rosenthal, MB** Hard choices—alternatives for reining in Medicare and Medicaid spending." New England Journal of Medicine, 2011; 364(20):1887-1890.

20. **Rosenthal, MB,** David M. Cutler, and Judith Feder. The ACO rules—striking the balance between participation and transformative potential. New England Journal of Medicine, 2011; 364(20):1887-90.

21. **Chien AT,** Rosenthal MB**.** Waste not, want not: promoting efficient use of health care resources. Ann Intern Med, 2013; 158(1):67-68.

22. **Rosenthal MB**, Mello MM. Sunlight as disinfectant--new rules on disclosure of industry payments to physicians. New England Journal of Medicine, 2013; 368(22):2052-2054.

23. **Rosenthal MB**, Farley T, Gortmaker S, Sunstein CR. Health promotion and the state. New England Journal of Medicine, 2013; 368(25):e34.

24. Wharam, JF, Ross-Degnan D, **Rosenthal MB**. The ACA and high-deductible insurance—strategies for sharpening a blunt instrument. New England Journal of Medicine, 2013; 369(16)1481-1484

25. Sinaiko AD, Chien AT, **Rosenthal MB**. The role of states in improving price transparency in health care. JAMA Internal Medicine, 2015; 175(6):886-887.

26. **Rosenthal MB**. Physician Payment After the SGR – the New Meritocracy. New England Journal of Medicine, 2015; 373:1187-1189.

27. Conti RM, **Rosenthal MB**. Pharmaceutical Policy Reform: Balancing Affordability with Incentives for Innovation. New England Journal of Medicine, 2016; 374:403-406.


**Book Chapters**

1. **Rosenthal MB**, Berndt ER, Donohue JM, Epstein AM, Frank RG. Demand Effects of Recent Changes in Prescription Drug Promotion. In Frontiers in Health Policy Research, v. 6, David M. Cutler and Alan M. Garber, eds, MIT Press, 2003 June.

2. **Rosenthal MB**, Donohue JM. Direct-to-Consumer Advertising of Prescription Drugs: A Policy Dilemma. In Ethics, Public Policy, and the Pharmaceutical Industry in the 21st Century, ed. M. Santoro, Cambridge University Press, 2006.

3. **Rosenthal MB**. Can Federal Provider Payment Reform Produce Better, More Affordable Healthcare? In The Future of Healthcare Reform in the United States, eds. A. Malani, M. Schill, University of Chicago Press, 2015.

**Testimony within the Last Four Years**

*April Krueger v. Wyeth, Inc.*, United States District Court for the Southern District of California, Civil Action No. 03CV2496 JAH (AJB).

*Health Net, Inc. v. Solvay Pharmaceuticals, Inc. and Unimed Pharmaceuticals, Inc.*, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:11-CV-0334.

*In re Actiq Sales and Marketing Practices Litigation*, United States District Court for the Eastern District of Pennsylvania, No. 07-CV-4492.

*In re United States of America v. Pfizer, Inc.*, United States District Court for the District of Massachusetts, Case No. 1:10-CV-11166-DPW.

*In re: Celexa and Lexapro and Sales Practices Litigation*, United Sstates District Court for the District of Massachusetts, Case No. 09-MD-2067 (NMG); MDL No. 2067.

*In re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409, Civil Action No. 112-cv-11711 and *In re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409.

*In Re: Prograf Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2242, Master File No. 1:11-cv-2242-RWZ.

*In re: Skelaxin (Metaxalone) Antitrust Litigation*, The United States District Court for the Eastern District of Tennessee, Lead Case No. 2:12-cv-83, MDL. No. 2343.

*Mary K. Jones v. Pfizer Inc., et al.*, United States District Court for the Southern District of New York, Civil Action No. 1:10-cv-03864-AKH.

*Monica Barba and Jonathan Reisman, on behalf of themselves and all others similarly situated v. Shire U.S., Inc., et al.,* United States District Court of the Southern District of Florida, Case No. 1:13-21158-Civ-LENARD/GOODMAN.

*Plumbers and Pipefitters Local 572 Health and Welfare Fund, et. al. v. Biovail Corporation, Biovail Laboratories, Inc., Biovail Laboratories International SRL, and Smithkline Beecham D/B/A Glaxosmithkline, PLC*, United States District Court for the Eastern District of Pennsylvania, CA No. 08-CV-2433-MAM.

*United States of America ex rel. Kevin N. Colquitt vs. Abbott Laboratories*, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:06-cv-01769-M.

*United States of America vs. Solvay S.A.,* In the United States District Court for the Southern District of Texas, Civil Action No. 06-2662.

*In re: Solodyn (Minocycline Hydrochloride) Antitrust Litigation* (relating to all actions), MDL No. 2503, 1:14-MD-2503-DJC.